## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KIRK WAHL,

     *Plaintiff*,

*v.*                      CASE NO. 13-CV-12793

CAROLYN W. COLVIN        DISTRICT JUDGE MATTHEW F. LEITMAN
Commissioner of Social Security,   MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Kirk Allen Wahl was forty-eight years old at the time of the most recent administrative hearing. (Transcript, Doc. 7 at 40.) Plaintiff worked as a carpenter in automobile factories for General Motors from 1994 until 2008, (Tr. at 41-42, 47, 165), and owned a construction company in 2009, (Tr. at 47-50, 156). He filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.*, on April 27, 2010, alleging that he became unable to work on December 12, 2008. (Tr. at 142.)

The claim was denied at the initial administrative stage. (Tr. at 85.) In denying Plaintiff's claims, the Commissioner considered ischemic heart disease and inflammatory arthritis. (*Id.*) On May 4, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Craig Petersen, who considered the application for benefits de novo. (Tr. at 35-71.) In a decision dated February 8, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 19, 29.) Plaintiff requested a review of this decision on February 19, 2012. (Tr. at 12-13.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on April 25, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On June 25, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity

Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105. The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting

*Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.      Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means

inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes

a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d

at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of

limitations caused by her impairments and the fact that she is precluded from performing her past

6

relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.   ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2014 and had not engaged in substantial gainful activity since December 12, 2008, the alleged onset date.[2] (Tr. at 21.) At step two, the ALJ found that Plaintiff had the following severe impairments: "psoriatic arthritis, right shoulder degenerative joint disease, asthma/chronic obstructive pulmonary disease (COPD), sleep apnea, coronary artery disease with atrial fibrillation, and obesity." (Tr. at 22.) The ALJ also concluded that Plaintiff's depression, coccyx area pain, cervical spine degenerative disc disease, gastroesophageal reflux disease, hyperlipidemia, and hypertension were not severe impairments. (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 22-24.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 28.) The ALJ also found that Plaintiff was forty-five years old on the alleged disability onset date, which put him in the "younger age" category under 20 C.F.R. § 404.1563. (*Id.*) At step five, the ALJ found that

---

[2] The ALJ found that Plaintiff's post-onset earnings from his business were likely less than $10,000 and did not rise to the level of substantial gainful activity. (Tr. at 21.)

Plaintiff could perform a limited range of sedentary work in jobs existing in significant numbers in the regional economy. (Tr. 24-28.)

### E.    Administrative Record

The earliest medical reports in the Record come from Plaintiff's visits with Dr. Sanjeev Prakash in 2007.[3] (Tr. at 272.) The progress notes are brief and somewhat vague. On August 20, 2007, Dr. Prakash wrote that Plaintiff, "has been doing really well," and that Darvocet "controls his pain." (*Id.*) All of the laboratory results were normal and none of his joints were swollen. (*Id.*) Dr. Prakash refilled prescriptions for methotrexate, sulfasalazine, and Darvocet-N 100. (*Id.*) The next appointment, on November 7, 2007, found Plaintiff still faring well, with manageable pain, the ability to remain "[p]hysically . . . fairly active," normal laboratory results, and no joint swelling or tenderness. (*Id.*)

Plaintiff returned to Dr. Prakash three months later, on February 22, 2008, reporting a prolonged "episode of knee pain and swelling," but maintained that he was "doing well." (*Id.*) Dr. Prakash did not discover any swelling. (*Id.*) In May, he told Dr. Prakash he had felt "achy and stiff," particularly in his hands and knees, for the past few months. (*Id.*) There was still no swelling, though his grip strength was poor and his knees had mild tenderness. (*Id.*) Dr. Prakash refilled his prescriptions and waited to see if the pain persisted before increasing the sulfasalazine dosage. (*Id.*)

--------

[3] Plaintiff also provided numerous reports from 2005 concerning his mental health. (Tr. at 218-53.) He did not claim disability due to any mental impairment; as his representative explained in a pre-hearing brief to the ALJ, Plaintiff grounded his disability on "degenerative psoriatic arthritis, occupational asthma, coronary artery disease, degenerative disc disease, sleep apnea, and right shoulder pain." (Tr. at 217.) Nor did Plaintiff list mental impairments in his application or other paperwork. (Tr. at 166-69, 178, 189-96.) At the hearing, Plaintiff stated he had no mental impairments and that the records showing he was bi-polar represented a mis-diagnosis. (Tr. at 54.) His appeal from the ALJ's decision does not dispute that mental problems were severe impairments. (Doc. 11.) And the ALJ incorporated limitations into the RFC to reflect the mental health records. (Tr. at 22.)

The next examination report in the Record is from September 3, but sometime before this visit Plaintiff's sulfazalazine dosage was increased. (Tr. at 273.) In September he reported that the new dosage "has not made any difference in his pain[:] in fact he says that he is a lot more achy and stiff for almost 2 hours in the morning." (*Id.*) His knees were swollen and, upon Plaintiff's inquiry, Dr. Prakash provided a steroid injection. (*Id.*) He also switched from sulfazalazine  to leflunomide. (*Id.*) The new drug failed to provide relief and before his next appointment he began using Vicodin, which worked better. (*Id.*) On November 10, he requested and received a prescription for Enbrel and Vicodin. (*Id.*) His blood work remained normal and his swelling mild. (*Id.*)

Plaintiff reported on January 7, 2009 that Enbrel seemed to help his psoriatic arthritis more than any other drug had, though it did cause a slight lung infection. (*Id.*) Plaintiff continued to feel well through the next appointment, on April 1, and noted non-severe pain only in his right shoulder. (Tr. at 274.) He told Dr. Prakash that he hoped to open a construction business and wondered if he had any physical limitations. (*Id.*) "I told him that [his] limitation really is pain," Dr. Prakash wrote, and advised Plaintiff that "he can try it and see how he does." (*Id.*) The pain and swelling returned by July. (*Id.*) He asked for, and received, knee injections and Dr. Prakash replaced the Enbrel prescription with Kineret. (*Id.*) The new prescription worked well, reducing his swelling by the next appointment in October. (*Id.*)

Plaintiff returned on January 11, 2010 with new complaints. (Tr. at 275.) His tailbone ached, perhaps from a fall the previous year, and his left ankle was swollen. (*Id.*) Dr. Prakash found slight swelling in Plaintiff's hand and ankle, but "[m]arked tenderness in [the] coccyx." (*Id.*) He also received more injections and an x-ray examination. (*Id.*) The radiology results showed his

9

sacrum was intact but that his fall the year prior likely caused "[p]osterior subluxation by a significant 6.2 mm of the second coccygeal segment on the first." (Tr. at 276, 592.)

Bruce M. LaBrecque, a physical therapist, saw Plaintiff on January 29, 2010, for an initial evaluation of his sacrococcygeal pain. (Tr. at 315, 349.) Plaintiff alleged a decrease in functional activities and grudgingly gave a pain level of three or four out of five on a visual analog ("VA") scale. (Tr. at 351.) He could sit for ten minutes before his tailbone started throbbing, with only medication and walking providing relief. (Tr. at 354.) Mr. LaBrecque noted the tight muscles in the area and set out a treatment regimen of therapeutic exercises, manual therapy, health treatment, and patient education. (Tr. at 349-50.) He further observed that Plaintiff walked normally, had normal functioning in his arms and legs, had no "[d]eficits that limit lifting," and sat askew to avoid resting directly on his coccyx. (Tr. at 352.) Plaintiff apparently resisted Mr. LaBrecque's "suggestion that his pain may be at least partially due to restriction of the muscles attaching to the coccyx," and became contentious at times. (Tr. at 317, 353.) Mr. LaBrecque diagnosed coccydynia and established improvement objectives. (Tr. at 350, 353.)

Plaintiff's first actual treatment with Mr. LaBrecque was on February 3, 2010. (Tr. at 347.) Lying on his right side, Plaintiff received "progressive myofascial release to the [right] coccygeus muscle followed by focal soft tissue mobilization directly over the coccyx." (*Id.*) Mr. LaBrecque felt that the process was successful and that the subluxation had decreased. (Tr. at 348.) The next week, on February 10, Plaintiff reported persisting pericoccygeal pain, but it was "hard to tell if it's worse a[s] []he has been sitting a lot doing office work." (Tr. at 345.) The therapist repeated the myofascial and tissue mobilization treatments from the prior session, which provided relief, though Plaintiff had "some obvious discomfort assuming the sitting position immediately

following treatment." (Tr. at 346.) Plaintiff was sore the following day but his pain had decreased by the next appointment on February 12. (Tr. at 344.) Mr. LaBrecque applied the same treatment, and this time Plaintiff reported less immediate soreness. (Tr. at 345.)

The pain remained static through the final appointment, on February 15. (Tr. at 342.) Mr. LaBrecque attempted a new procedure, hoping to "mobilize the coccyx bimanually via internal and external contact with the coccyx," but could not "definitively palpate the bony 'step off' [he] anticipated finding due to the subluxation . . . ." (*Id.*) In the discharge paperwork, Mr. LaBrecque wrote that Plaintiff had achieved the "maximum potential" from therapy, which unfortunately did not ease the pain or increase his functioning. (Tr. at 337.) He believed that the therapy produced partial myofascial release of the coccygeus, decreased pericoccygeal muscle restriction, and that the sacral asymmetry had "spontaneously corrected without intervention." (Tr. at 339-40.) Plaintiff's subjective complaints nonetheless did not change. (Tr. at 337, 339, 590.) Mr. LaBrecque sent a note to Dr. Dominador Laynes, Plaintiff's primary physician, (Tr. at 589), after discharge, telling him that physical therapy did not "effect any objective change . . . [or] positively affect [Plaintiff's] subjective pain reports." (Tr. at 343, 590) Overall, the therapy was unsuccessful. (Tr. at 261, 343, 590.)

In June, 2010, Plaintiff developed severe pain in his right leg while jumping rope and performing martial arts. (Tr. at 407.) The ultrasound Dr. Prakash ordered to check for potential Baker's cysts or Achilles tendon tears revealed no abnormalities. (Tr. at 407, 591.) The Enbrel had clearly lost its effect. (*Id.*) One month later, on July 23, Plaintiff reported that his "calf pain and swelling ha[d] subsided completely" and that his "[p]ain [was] much better." (*Id.*) He cut down on Norco, a Vicodin substitute, and Dr. Prakash decided to not refill his prescription. (*Id.*)

11

During the next visit, Plaintiff related that he felt "achy and stiff all over," physical therapy did not help his tailbone pain, and he was fatigued. (Tr. at 275.) The swelling and tenderness remained mild. (*Id.*) Dr. Prakash changed his prescription back to Enbrel, refilled his other medications, and "offered to refer him to [an] orthopedic surgeon [for his coccygeal subluxation], but he did not want that." (*Id.*)

Plaintiff saw Dr. Laynes on July 1, 2010 for joint pain. (Tr. at 309.) He told Dr. Laynes that he shut down his business "because he can't do it." (*Id.*) Dr. Laynes diagnosed asthma, potential fibromyalgia, psoriatic arthritis, and "[o]ther malaise and fatigue. (*Id.*) He ordered a pulmonary function test and other examinations of the fatigue." (*Id.*) Plaintiff informed Dr. Laynes on July 15 that an independent examination found he had an irregular heartbeat, though the examiner would not be able to provide the diagnostic results to Dr. Laynes. (Tr. at 310.) Though his notes only record a telephone call on that date, Dr. Laynes assessed atrial fibrillation and decided to increase the diltiazem dosage. (*Id.*)

Plaintiff's chest pain increased on August 4 during a consultation with Dr. Peter G. Fattal, who noted that his "exercise capacity is becoming fairly limited" and sent him to the emergency room. (Tr. at 321, 323, 390.) The hospital admitted him but he refused to stay. (*Id.*) He changed his mind the next day and returned for "evaluation of atrial fibrillation and possible cardiac catheterization with potential direct current cardioversion." (Tr. at 324.) Plaintiff denied "any chest discomfort." (*Id.*) Dr. Fattal later examined Plaintiff, observing that he was "in no apparent distress" and his chest was "clear." (*Id.*) He assessed atrial fibrillation, coronary artery disease, and noncompliance. (*Id.*) During that day and the next, Plaintiff underwent multiple procedures, including an transesophageal echocardiogram, angioplasty and stenting, catheterization, and

12

ventriculography. (Tr. at 325-30.) Dr. Fattal reported that both ventricles were enlarged and the left ventricle was "mildly impaired," had "some mild hypokinesis," and had "high grade" stenosis." (Tr. at 326-30.) The discharge report listed twenty-two medications that Plaintiff took. (Tr. at 321-22.)

Plaintiff saw Dr. Laynes again on October 18, 2010 with renewed complaints of back, shoulder, knee, and toe pain. (Tr. at 417, 524.) Dr. Laynes was able to reproduce the shoulder pain, but otherwise the results were normal. (*Id.*) The pain probably resulted from rotator cuff tendinitis, he concluded, and he recommended that physical therapy or strength exercises might help.[4] (Tr. at 418.) X-rays of the shoulders came back on October 26, 2010, showing "[m]ild degenerative changes . . . but no other significant abnormality." (Tr. at 421, 534.) On October 22, Dr. Prakash found mild swelling in the hands and knees. (Tr. at 539, 588.) Plaintiff's complaints of pain suggested that Enbrell and Norco were no longer working and that Kineret and Tylenol with codeine should be reintroduced. (*Id.*)

On the morning of December 3, Plaintiff awoke with shortness of breath and dizziness, but no chest pains or blurred vision. (Tr. at 425-26.) He was also wheezing, without coughing up any phlegm. (Tr. at 436.) He drove to the emergency room, where he saw Drs. Kassas Safwan and Tucker Dalkeith. (Tr. at 425-28.) There, he developed chest pain and the physicians administered intravenous medication. (Tr. at 427.) The EKG showed atrial fibrillation, the x-ray moderate cardiomegaly and diffuse interstitial changes. (*Id.*) The chest pain and wheezing subsided by the next examination, and Plaintiff was admitted to the Michigan CardioVascular Institute. (Tr. at

---

[4] Plaintiff also had blurred vision, and Dr. Laynes recommended seeing a specialist. (Tr. at 417-18, 524.) On October 21, Dr. Eric S. Coller, an ophthalmologist, wrote to Dr. Laynes that he examined Plaintiff and diagnosed dry eye syndrome. (Tr. at 422, 538.) He added that Plaintiff's psoriatic arthritis had not caused ocular inflammation. (*Id.*)

427.) X-rays and CT scans of the chest revealed moderate cardiomegaly and interstitial changes in both lungs. (Tr. at 447-50.)

The emergency-room physicians consulted Dr. Laynes, who requested that Dr. Ansari Farhan examine Plaintiff's asthma while he remained in the hospital. (Tr. at 431-36.) Dr. Farhan detailed a brief history of the condition, noting that Plaintiff's new medications, Alvesco and Serevent improved the symptoms. (Tr. at 436-37.) He prescribed DuoNeb and Zithromax to supplement his normal asthma medications. (Tr. at 438.) Plaintiff took Multaq and Pradaxa at the hospital, his heart rate improved, and he was sent home with prescriptions for both. (Tr. at 429.) The diagnoses upon discharge two days later were atrial fibrillation, chronic obstructive lung disease, hypertension, hypercholesterolemia, sleep apnea, and psoriatic arthritis. (*Id.*)

Plaintiff's breathing had improved by his follow-up appointment with Dr. Laynes on December 13, 2010. (Tr. at 525-27.) He informed Dr. Prakash a few days later that his pain and swelling had decreased since his hospitalization. (Tr. at 588.) Dr. Prakash prescribed Norco for the remaining pain and admonished Plaintiff to stop switching between medications before the prescriptions ran out. (*Id.*)

The Michigan Disability Determination Service requested Plaintiff meet with Dr. Richard C. Gause for an independent evaluation on December 15, 2010. (Tr. at 452-55.) He told Dr.Gause he quit working because of his "extrinsic occupationally-induced asthma." (Tr. at 452.) Plaintiff also apparently claimed, for the first time, that his sputum contained "a fair amount of blood." (*Id.*) He estimated that he could slowly walk one block and climb one flight of stairs before stopping. (*Id.*) Dr. Gause's observations began with the contrast between Plaintiff's placid and relaxed behavior in the waiting room, and his condition "in the exam room," where "he was huffing and

14

puffing, complained of chest pain and took nitroglycerin[], complained of shortness of breath and had several periods where he had to sit and recompose because of dizziness and/or chest distress." (Tr. at 453.)

Dr. Gause was "very concerned" about the contrast in conduct, particularly because the auscultation found normal breathing sounds despite asthma. (Tr. at 453-54.) His heart rate was elevated at 160 beats per minute, (Tr. at 453), but he took nitroglycerin during the examination, which increases the heart rate. *Nitroglycerin*, Tablet [Glenmark Generics Inc.], DailyMed, http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=78fd9e96-6bfc-4c36-b1da-3a63473aade9 (last revised September, 2009). All other measures were normal: his grip strength remained intact, his dexterity was unimpaired, his flexion and extension ranges were normal, he walked on his toes and heals, he squatted almost halfway down, his reflexes were intact, his motor strength appeared normal, and his joints had no laxity, crepitance, or effusion. (Tr. at 454.)

A "sleep study" conducted on December 28, 2010, confirmed Plaintiff's problems with sleeping. (Tr. at 502-03, 540-45.) As a result, one of his doctors ordered him a CPAP machine. (*Id.*) In March, 2011, Plaintiff told Dr. Laynes his new CPAP and herbal medications reduced his wheezing, and that he had no chest pain or palpitations. (Tr. at 528.) The rest of the health indications at that time, including his heart rate, appeared stable. (Tr. at 529.) Later that month, he reported to Dr. Prakash that his arthritis was controlled and his joints felt fine. (Tr. at 587.)

His lower back began hurting in April, with pain radiating to his left thigh, at a three-out-of-five level on the VA scale. (Tr. at 531.) Walking less than half a mile caused pain. (*Id.*) Dr. Laynes found that his hamstrings were tight, and suggested his chronic joint pain might come from spondyloarthropathy. (Tr. at 532.) By all other measures, however, Plaintiff appeared healthy. The

range of motion in his back was normal, his gait was normal, his heart rate was regular, his foot strength was normal, and his sacroiliac joint was not tender. (*Id.*) Dr. Laynes suggested a few simple exercises. (*Id.*)

During a June 10 appointment with Dr. Prakash, Plaintiff complained that his arthritis "flared up" in May, his right heel hurt, and increasing the dosages on methotrexate and Norco provided little relief. (Tr. at 587.) His fingers were puffy and his left plantar was tender as well. (*Id.*) Dr. Prakash refilled a few of his prescriptions, switched the Kineret to Humira, gave him podiatric exercises, and advised him to wear shoe inserts. (*Id.*) Plaintiff told Dr. Laynes in July that the change to Humira helped, and he had no other significant pain or trouble breathing. (Tr. at 561-63.) In fact, his only new issue was sunburn on his arms. (Tr. at 562.)

At some point in 2011, Dr. Laynes referred Plaintiff to Dr. Asim Yunus to treat his coronary issues. (Tr. at 529, 549.) On July 14, 2011, Dr. Yunus performed a pulmonary vein isolation electrogram map and ablation procedure to stop Plaintiff's arrhythmic heart beat. (Tr. at 549-59.) Dr. Yunus estimated a seventy-percent chance that the procedure would improve Plaintiff's condition. (Tr. at 557.) The procedure went well and Plaintiff's heart rate and rhythm returned to normal the night of the surgery. (Tr. at 554.) He advised Plaintiff to use a CPAP at night and to lose weight. (Tr. at 557.) The temporary monitor Plaintiff received showed a stream of normal results when Dr. Yunus reviewed it on October 12. (Tr. at 559.) At a check-up on October 18, Plaintiff reported that he had not experienced symptoms since the procedure and, though atrial fibrillation was incurable, both he and Dr. Yunus believed that "aggressive use of CPAP may make a big difference to the risk of recurrence . . . ." (Tr. at 549, 553.)

Plaintiff consulted with Dr. Prakash on August 31, 2011, informing him that he liked Humira but thought its effects were too short-lived. (Tr. at 587.) His fingers had minimal swelling during the visit, (*Id.*), but by his next session with Dr. Laynes on October 4 they became painful and sometimes numb. (Tr. at 567.) Tinel's and Phalen's tests were positive, indicating carpal tunnel syndrome. (Tr. at 568.) Dr. Laynes provided a wrist splint and considered ordering an eclectromyogram if the problem persisted. (*Id.*) Plaintiff tried the splints for two weeks before returning to Dr. Laynes for additional treatment. (Tr. at 573.) He also developed neck pain that seemed to spread down to his hands. (*Id.*) His breathing was better, however, since he began using the CPAP. (*Id.*) His psoriasis now blotched his right eyelid. (Tr. at 574.) Dr. Laynes decided to x-ray the neck and then refer him to a physical therapist, and he also wrote a fourteen-day prescription for Triamcinolone to treat the psoriasis. (Tr. at 575.) The x-ray showed "very minimal degenerative disk space narrowing at [the] C4-C5 and C5-C6 level," but was "otherwise unremarkable." (Tr. at 585, 626-27.)

The medical record concludes with notes from a December 7, 2011 appointment with Dr. Prakash.[5] (Tr. at 587.) Plaintiff appeared upbeat, stating he was "doing better" and had little if any joint stiffness in the morning even though he took less Norco. (*Id.*) A few of his joints had minimal swelling. (*Id.*)

At the hearing administrative hearing, Plaintiff told the ALJ that he lived with his twelve year old son. (Tr. at 41.) He had attended college and finished an apprenticeship program terminating in a carpentry certificate. (Tr. at 44.) Before working as a carpenter, he served three

---

[5] Test results for an unrelated medical issue, completed in January, 2012, after the hearing, are also present in the Record. (Tr. at 623-26.) Aside from its irrelevance to the present case, it is not clear that the ALJ viewed these records, putting them outside of the Court's review. (Tr. at 38.) *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

17

years in the Navy as a machinist's mate. (Tr. at 45.) At General Motors, he could not work in areas with smoke, dust, or chemical fumes, and he also had temporary exertional limitations. (Tr. at 45-46.) His job was physically demanding; at times he would lift 120 pound bags of concrete. (Tr. at 47-48.) He had not worked since December 12, 2008, (Tr. at 45), but was called back in October of 2009 for one day, only to find that General Motors did not have available jobs conforming to his restrictions. (Tr. at 42, 46.)

In the summer before his unsuccessful call back with General Motors, Plaintiff renewed his builder's license and opened a construction company. (Tr. at 48-49.) He testified that he did not hire employees, forcing him to undertake the physical labor. (*Id.*) He installed a deck, remodeled a bathroom, and landscaped, lifting approximately 100 to 150 pound objects in the process. The work became unsustainable after roughly six months and he consequently closed his business. (*Id.*)

The ALJ then asked about his impairments, beginning with atrial fibrillation. (Tr. at 50.) Plaintiff recounted his medical history ending with the ablation procedure that had, as of the hearing, eliminated the atrial fibrillation, though Plaintiff carried nitroglycerin for chest pain. (Tr. at 50-51.) Inhalers kept his "breathing normal." (Tr. at 51.) His right shoulder would "lock," preventing him from raising his arm above his shoulder. (Tr. at 52.) His sleep apnea disrupted his rest and drained his energy throughout the day, even after he began using the CPAP. (Tr. at 53.) The psoriatic arthritis sporadically affected his hands, feet, back, and shoulders, causing stiffness, swelling, pain, and also plantar fasciitis. (*Id.*) He then described the impressive list of medications he took, noting a few accompanying side effects, including muscle aches, fatigue, and diminished cognition. (Tr. at 54-55.) The injections worked for limited periods and needed to be rotated to retain efficacy. (Tr. at 65.)

He could not give a solid estimate of his "regular" exertional abilities because his arthritis struck randomly, every month or two, and lasted one to three weeks. (Tr. at 56.) During an episode, he struggled to lift a gallon of milk and could sit or stand for more than fifteen minutes without changing positions. (*Id.*) When the arthritis pain subsided he could walk over one mile. (Tr. at 57.) His fingers hurt constantly, but even during a flare up he could dress himself. (Tr. at 57-58.)

His daily activities included kitchen work, cooking, laundry, and shopping; he could vaccuum but did not because it caused asthma attacks. (Tr. at 59.) He had recently lost twenty pounds that he gained weight while struggling with his heart problem. (Tr. at 60.) He enjoyed reading and would hunt, sometimes taking overnight trips, (Tr. at 60-61), four or five times per year. (Tr. at 61-62, 193.)

The ALJ then asked if there were any jobs he could perform full-time, eliciting Plaintiff's response that "[i]f General Motors brought me back to that job that I was doing, I think I could [do] it still, yes." (Tr. at 64.) He said he probably could not do simple jobs sorting parts, but reconsidered and concluded he could inspect items during "normal times." (Tr. at 64.)

The ALJ then posed a hypothetical to the VE, asking her to consider an individual with Plaintiff's background who

> can occasionally lift, carry, push, and pull up to 10 pounds; stand or walk up to two hours out of an eight-hour work day; sit up to six hours out of an eight-hour work day, with normal breaks; could occasionally stair and ramp climb, but not ropes, ladders, or scaffolds.
>
> There would be no overhead work; work limited to frequent gross manipulation; must avoid concentrated exposure to heat, humidity, cold, gases, and fumes; must avoid unprotected heights and dangerous machinery; must avoid vibration when using the upper extremities.
>
> There are no limitations regarding concentration, persistence, and pace, and there are no social deficits.

19

(Tr. at 68.) The VE responded that the individual could not perform Plaintiff's past jobs but could work in various sedentary, unskilled jobs: packager (2,100 positions in Michigan, 68,000 nationally), information clerk (2,400 in Michigan, 83,000 nationally), and general office clerk (3,100 in Michigan, 96,000 nationally). (Tr. 68-69.)

The ALJ then added a sit-stand at will option to the original hypothetical, and also limited the job base to "simple, routine, and repetitive tasks" involving "simple work-related decisions with few, if any, workplace changes. (Tr. at 69.) Under this scenario, the hypothetical individual could still perform the packager and information clerk positions, along with assembler positions (2,000 in Michigan, 41,000 nationally). (*Id.*) The ALJ's final hypothetical assumed all the restrictions in the first two and added that the individual would be off task twenty-five percent of the time and miss at least three days of work per month due to her impairments. (*Id.*) This precluded all work. (Tr. at 70.)

### F.      Analysis and Conclusions

### 1.      Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he had the residual functional capacity ("RFC") to perform a limited range of sedentary work:

> [C]laimant has the [RFC] to occasionally lift, carry, push, and pull up to 10 pounds. He can stand or walk up to 2 hours out of an 8-hour workday. He can sit up to 6 hours out of an 8-hour workday with normal breaks. He can occasionally climb stairs and ramps, but he cannot climb ropes, ladders, or scaffolds. He can perform no overhead work. He can perform frequent gross manipulation. He must avoid concentrated exposure to heat, humidity, cold, gases, and fumes. He must avoid unprotected heights and dangerous machinery. He must avoid vibration when using the upper extremities. The claimant requires a sit/stand option at will. The claimant can perform only simple, routine, and repetitive tasks. His work should involve only simple work related decisions with few, if any, workplace changes.

(Tr. at 24.) Sedentary work

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.      Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff criticizes the ALJ's hypothetical for inaccurately describing his impairments.[6]

(Doc. 9 at 8.) I suggest that this claim–that the RFC is inaccurate–fails.

### a.    Medical Sources, Plaintiff's Credibility, and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42

U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations

carve the evidence into various categories, but the only relevant distinction for present purposes

is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable

medical sources" include, among others, licensed physicians and licensed or certified

psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not

"acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d).

---

[6] Plaintiff's argument ultimately attacks the RFC for lacking substantial evidence. The text of his Motion and Brief, however, suggests a slightly different emphasis: he criticizes the hypothetical for not accurately reflecting the RFC, and thus claims the Commissioner failed to meet her burden at stage five. His Motion itself does not address the RFC. (Doc. 9 at 1-2.) Rather, it states,"The Defendant determined that the Plaintiff is unable to perform any of his past relevant work, and according to applicable laws of the Circuit, the Defendant, therefore, has the burden of proving that a significant number of jobs exist which the Plaintiff is able to perform." (*Id.* at 1.) He continues, "The evidence in the record establishes that the Defendant's final decision was based upon errors of law, giving [rise] to a final decision that is not supported by substantial evidence and is contrary to" the law. (*Id.*)

His Brief frames the issue as "[w]hether the Commissioner erred as a matter of law in failing to properly evaluate the medical records and opinions of evidence, and thereby formed an inaccurate hypothetical that did not accurately portray Mr. Wahl's impairments?" (Doc. 9 at 7.) In his argument, Plaintiff notes that the burden shifts to the Commissioner at step five, stating, "In this case, the Commissioner failed to satisfy this burden of proof[,] warranting reversal or remand." (Doc. 9 at 8.) He elaborates that "[b]ecause each element of the hypothetical does not accurately describe Mr. Wahl in all significant, relevant respects, the VE's testimony at the hearing should not constitute substantial evidence. The ALJ did not properly evaluate Mr. Wahl's impairments in the first hypothetical question, and therefore, the hypothetical is flawed." (Doc. 9 at 9.) He then sets forth the standards for evaluating medical source opinions and recounts his testimony at the hearing. (Doc. 9 at 9-11.)

He comes close to making a more explicit "substantial evidence" argument by twice stating that the ALJ's conclusions were not substantiated. (Doc. 9 at 10.) But after the paragraph containing those two statements, he reverts to addressing the hypothetical, concluding that the "first two hypotheticals are improper" because he "was incapable of performing even these representative jobs" listed by the VE. (Doc. 9 at 12.) The bulk of the argument therefore explicitly discusses the hypothetical and the Commissioner's stage-five burden. He only hints at the "substantial evidence" review and his own burden to prove the impairments comprising the RFC; nonetheless, his claim is premised on a faulty RFC determination and thus the Commissioner's "burden of proof" at stage five is irrelevant.

There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from non-treating acceptable sources, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant,  "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are

23

"not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[7] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Finally, the social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

---

[7] The Commissioner's power to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

While "'objective evidence of the pain itself'" is not required. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)    [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four

25

stages of analysis. *Jones*, 336 F.3d at 474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

### b.    Analysis

Plaintiff argues that the hypothetical did not reflect his actual impairments, and consequently the Commissioner erred in relying on it to meet his stage-five burden of proof. (Doc. 9 at 8-9.) His discussion of the relevant law begins by asserting that hypotheticals must accurately encompass all impairments. (*Id.* at 8.) He then covers, in little more than one page, the law at the core of his contention by describing treating sources and RFC requirements. (*Id.* at 9-10.) Shifting to the analysis, he seeks to prove the RFC was flawed by adducing evidence almost exclusively from his testimony. (*Id.* at 10-12.) He then asserts that his daily and social activities do not reflect his vocational capacity because "[o]ne must consider the option to stop whatever the pain inhibitor may be while doing daily activities, while being at work, one does not have that option." (*Id.* at 11.) Finally, he ends with the assertion, unadorned by explanation, that he could not perform any jobs under the restrictions imposed by the RFC. (Tr. at 11-12.)

26

I suggest that substantial evidence supported the ALJ's findings. Plaintiff did not link any of the evidence he cites to relevant legal standards. For example, though he describes the treating source and medical opinion rules, he never explains how they affect the case or how the ALJ improperly evaluated the evidence. In contrast, the ALJ appropriately weighed the medical sources and Plaintiff's subjective complaints under the requirements of 20 C.F.R. § 404.1527(c). The opinions in the Record did not give the ALJ much to do in this regard; as he pointed out, few, if any, opinions describe relevant vocational limitations. (Tr. at 27.) When asked, Dr. Prakash told Plaintiff that his "limitation really is pain" and he could try to start a construction business. (Tr. at 274.) That this solicited opinion on work restrictions stands alone in the Record indicates the ALJ properly found Plaintiff was not disabled. *See Nunn v. Bowen*, 828 F.2d 1140, 1145 (6th Cir. 1987) ("If [the claimant's] examining physicians did not advise him of a need to restrict his activities in light of the combination of his hypertension and back problems, we believe that it was not erroneous for the ALJ to determine that [the claimant] did not have a combination of impairments that would lead to a determination of disability for social security purposes."); *Prescott v. Comm'r of Soc. Sec.*, No. 11-11226, 2012 WL 3965757, at *1-4, 8-9 (E.D. Mich. Sept. 11, 2012) (citing *Nunn* and holding that the ALJ properly found no disability because, in part, no medical source offered any vocational restrictions).

The ALJ was consequently relieved from wading into a thicket of contradictory opinions and closely scrutinizing their supportability and consistency. 20 C.F.R. §§ 404.1527(c)(3), (4). Instead, the opinions were straightforward and the ALJ adequately addressed them. He noted that Plaintiff's psoriatic arthritis occurred only occasionally, was typically mild, and, according to Dr. Prakash, was sufficiently controlled by medication. (Tr. at 25, 587-90.) Plaintiff's joint pain did

not impede his gait or reflexes, (Tr. at 25, 417, 524, 532), and aside from ambiguous and contradictory testimony at the hearing, (Tr. at 55, 63), Plaintiff never contended–and in fact denied–that the medications affected his cognition. (Tr. at 25, 178, 194.) The allegations of severe pain in his right shoulder lacked supporting objective evidence. (Tr. at 25, 421, 534.)

The ALJ further discussed the success Plaintiff had in treating his asthma, chronic obstructive pulmonary disorder, sleep apnea, and atrial fibrillation. (Tr. at 25-26.) Examinations frequently showed that Plaintiff had stable breathing. (Tr. at 26, 453-54, 525-27, 561-63, 573.) Plaintiff also reported that the CPAP helped him achieve significant improvements in his conditions. (Tr. at 26, 573.) The ALJ then described Plaintiff's extensive ordeal with atrial fibrillation, which ended, at least temporarily, with a successful ablation procedure that prevented any reoccurrence prior to the hearing. (Tr. at 26, 50-51, 549, 553, 557, 559.) Finally, the ALJ accurately noted that the Record contained nothing suggesting that Plaintiff's obesity alone, or in combination with other impairments, precluded work. (Tr. at 27.) His physicians encouraged him to lose weight, but this advice generally related to his coronary issues or other problems and was not tied to specific restrictions brought on by obesity. (Tr. at 360, 529.) The ALJ bolstered his analysis with results from the consultative examination by Dr. Gause. (Tr. at 27.) The tests, conducted shortly after Plaintiff's hospitalization, showed he had clear breathing and normal motor strength, gait, and range of motion. (*Id.*)

The ALJ's credibility analysis also properly addressed the factors in 20 C.F.R. § 404.1527(c). As shown above, he considered the treatments, medications, and other measures used for pain relief. (Tr. at 25-27.) He also looked at Plaintiff's daily activities, which included overnight hunting, jumping rope, performing martial arts, driving, personal care, shopping, and

28

reading. (Tr. at 27.) While evidence of most quotidian activities does not show full vocational capacity, *Rogers*, 486 F.3d at 248, the Plaintiff here was not simply scrubbing his head with shampoo, but rather sharpening his martial prowess and taking extended hunting trips. Moreover, he ran a company after the onset date, lifting heavy loads, which reasonably suggested to the ALJ that Plaintiff could work.[8] The ALJ also briefly mentioned that Plaintiff's receipt of unemployment benefits would have required him to affirm he could work. (Tr. at 27.) *See Duncan v. Comm'r of Soc. Sec.*, No. 08-11067, 2009 WL 2843918, at *1(E.D. Mich. Aug. 31, 2009) ("[T]he courts . . . have recognized that a claimant's application for or receipt of unemployment benefits may appropriately be considered as a factor in assessing the claimant's credibility.").

Though the ALJ questioned the basis for many of Plaintiff's complaints, he nonetheless incorporated them into his RFC. Plaintiff was limited to frequent gross manipulation to "account[] for his arthritis," (Tr. at 27), which reflects the medical evidence demonstrating his hand problems, (Tr. at 272-75, 587-90), but also his testimony that even during "flare-ups" he could button and zip his clothes. (Tr. at 57.) The arthritis and heart condition were cited to support a ten-pound limit on lifting, carrying, pushing, and pulling; a substantially lower weight than the 150 pounds he lifted and hauled for his construction company after his alleged onset date. (Tr. at 24, 27.) The ALJ also provided a sit-stand option, despite reports of Plaintiff's normal gait and his testimony that he recently walked one and one-half miles. (Tr. at 24, 57, 532.) Other restrictions addressed

---

[8] The ALJ could have also cited Plaintiff's testimony that he could work as a parts inspector when his arthritis was calm or do his old job at General Motors full-time. (Tr. at 64-65.) Additionally, Plaintiff's responsibility for his son also gives proof of capacities. *See Andersen v. Astrue*, No. 3:11-cv-250-JAG, 2012 WL 4498921, *7, 14-16 (E.D. Va. June 15, 2012); *Temples v. Astrue*, No. 1:11CV-00090-JHM, 2012 WL 590814, at *5-7 (W.D. Ky. Jan. 24, 2012).

Plaintiff's possible mental or emotional conditions, despite his denial of depression and the weak evidence for cognitive problems. (Tr. at 54.)

Finally, Plaintiff does not develop his argument that it would be "inhumane" to force him into the jobs the VE listed. To the extent this contention attacks the RFC, the analysis above applies. If Plaintiff instead means to imply that the VE herself drew inaccurate conclusions from the hypothetical, he has offered no reason to question the ALJ's reliance on the testimony. *See Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) ("Nothing in the applicable Social Security regulations requires an administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy."). The ALJ could therefore use the testimony to measure the job base.

Because substantial evidence supports the ALJ's findings, and he considered Plaintiff's abilities in constructing his hypothetical and RFC, I accordingly recommend that Plaintiff's Motion be denied.

### 3.     Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.


Date:  June 23, 2014                              /S Patricia T. Morris
                                                  Patricia T. Morris
                                                  United States Magistrate Judge

**CERTIFICATION**

31

2:13-cv-12793-MFL-PTM   Doc # 13   Filed 06/23/14   Pg 32 of 32   Pg ID 740

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.  A hard copy was provided to District Judge Leitman in the traditional manner.

Date:  June 23, 2014                    By      s/*Jean L. Broucek*
                                        Case Manager to Magistrate Judge Morris